IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DANYEL HILL, o/b/o M.H., a minor, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:12-00266-N |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

ORDER

Plaintiff Danyel Hill filed this action seeking judicial review of a final decision of

the Commissioner of Social Security ("Commissioner") that she was not entitled to

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the

Act), 42 U.S.C. §§ 1381-83c, on behalf of her son, M.H., a minor child (Tr. 125-127).

Pursuant to the consent of the parties (doc. 27), this action has been referred to the

undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment

in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73.  *See* Doc. 22.  The parties'

joint motion to waive oral arguments (doc. 26) was granted on February 26, 2013 (doc.

29).  Upon consideration of the administrative record (doc. 15)[2], and the parties'

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit in view of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] On October 12, 2012, plaintiff filed a motion (doc. 16) to correct the record (doc. 15) by including updated school records (doc. 16-1), including a transcript and Individualized Education
(Continued)

respective briefs (docs. 18 and 24), the undersigned concludes that the decision of the Commissioner is due to be **REVERSED** and **REMANDED**.[3]

I.      Procedural History.

Plaintiff Danyel Hill filed an applications for SSI benefits on September 30, 2008, on behalf of her son, M.H.,  (Tr. 125-127), claiming an onset of disability beginning September 1, 2008, due to low birth weight and hearing loss in one ear (Tr. 153).  The application was denied on November 20, 2008 (Tr. 50-55).  Plaintiff timely requested a hearing on January 12, 2009 (Tr. 56-58) before an Administrative Law Judge ("ALJ").  A hearing was held on August 3, 2010 (Tr. 31-44).  The ALJ issued an unfavorable decision on September 27, 2010 (Tr. 11-27).  Plaintiff requested a review by the Appeals Council on November 19, 2010,[4] which was denied on February 16, 2012 (Tr. 1-6); thereby

---

Program (IEP).  The Commissioner's response in opposition is set forth in her brief filed on December 14, 2012 (doc. 24 at 10, 13).  The Commissioner argues, in sum, that plaintiff failed to establish that the evidence in question was actually received by the ALJ and that, at the hearing, no mention was made about any missing evidence and no request was made to keep the record open for the submission of additional evidence (doc. 24 at 10).  The Commissioner further argues that "both pieces of evidence were submitted to the Appeals Council (Tr. 201-14), and the Appeals Council considered this evidence as part of its denial of review (Tr. 1-7)."  (*Id.*).  The first five pages of the records sought to be admitted by the plaintiff are, in fact, already in the record.  *Cf.* Doc. 16-1 at 1-5 with Tr. 218-222.  The remaining pages (doc. 6-1 at 6-24) concern a "November 2011 [Individualized Education plan ('IEP')]," which the Commissioner argues is not relevant to the ALJ's decision dated September 27, 2010, and there is no evidence the Appeals Council actually received the document.  (Doc. 24 at 13).  Upon consideration and for these reasons stated by the Commissioner, it is **ORDERED** that plaintiff's motion (doc. 16) is hereby **DENIED.**

   [3] Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals.  *See* Doc. 28 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.").

   [4] Plaintiff's letter dated November 19, 2010, is not found in the record transcript but is referenced in the Appeals Council's notice dated February 16, 2012 (Tr. 1).

making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R.

§ 404.981, 422.210(a) (2012)[5].  Plaintiff has exhausted all her administrative remedies

and this case is ripe for judicial review under § 205(g) of the Act, 42 U.S.C. § 405(g).

    II.    <u>Issues on Appeal</u>.

    1.    Whether the ALJ erred by failing to consider the school records which plaintiff contends were submitted on June 16, 2010, and August 10, 2010?

    2.    Whether the ALJ erred in rejecting the opinion of plaintiff's retained, examining consultant, Donald W. Blanton, Ph.D?

    3.    Whether M.H. qualifies for SSI benefits under Listing 112.05D?

    4.    Whether the Appeals Council erred in failing to remand the case for proper consideration of the school records?

    III.    <u>Standard of Review</u>.

        A.    <u>Scope of Judicial Review</u>.

In reviewing claims brought under the Social Security Act, including those

involving benefits for an individual under the age of 18, such as this one, this Court's role

is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the

decision is supported by substantial evidence, and 2) whether the correct legal standards

were applied. *See*, 42 U.S.C. § 405(g); <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155,

1158 (11th Cir. 2004) (per curiam); <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir.

2001); <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999); <u>Martin v. Sullivan</u>, 894 F.2d

---

[5] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition.  Also, all references are to Part 404 of the regulations, which addresses claims under Title II of the Act. All of the cited regulations have parallel citations in Part 416 of the regulations, which addresses claims under Title XVI of the Act.

1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986); *see also* Davison v. Astrue, 370 Fed.Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (*citing* Dyer v. Bernhart, 395 F.3d 1206, 1210 (11th Cir. 2005)).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400;  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  Substantial evidence is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *See* Richardson v. Perales, 402 U.S. 389, 401 (1971); Crawford, 363 F.3d at 1158; Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence "is more than a scintilla, but less than a preponderance," Dyer, 395 F.3d at 1210.  "Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." Davison, 370 Fed.Appx. at 996, *quoting* Crawford, 363 F.3d at 1158-59.

In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is

substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d

227, 230 (11th Cir. 1991).

       B.     Standard Applicable to Childhood Disability.

The Personal Responsibility and Work Opportunity Act of 1996 became effective

on August 22, 1996. See Pub.L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified

at 42 U.S.C. § 1382c).  This legislation defined childhood disability as follows:

> An individual under the age of 18 shall be considered disabled for the
> purposes of this subchapter if that individual has a medically determinable
> physical or mental impairment, which results in marked and severe
> functional limitations, and which can be expected to result in death or
> which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42  U.S.C.  §  1382c(a)(3)(C)(i)  (1997).   The  regulations  state  that  an  "impairment(s)

causes  marked  and  severe  functional  limitations  if  it  meets  or  medically  equals  the

severity of a set of criteria for an impairment in the listings, or if it functionally equals the

listings." 20 C.F.R. § 416.924(d).

The regulations set forth a three-step sequential evaluation process that applies to a

childhood disability determination:

> We follow a set order to determine whether you are disabled.  If you are
> doing substantial gainful activity, we will determine that you are not
> disabled and not review your claim further.  If you are not doing substantial
> gainful activity, we will consider your physical or mental impairment(s)
> first to see if you have an impairment or combination of impairments that is
> severe.  If your impairment(s) is not severe, we will determine that you are
> not disabled and not review your claim further.  If your impairment(s) is
> severe, we will review your claim further to see if you have an
> impairment(s) that meets, medically equals, or functionally equals in
> severity any impairment that is listed in appendix 1 of subpart P of part 404
> of this chapter.  If you have such an impairment(s), and it meets the
> duration requirement, we will find that you are disabled.  If you do not have

> such an impairment(s), or if it does not meet the duration requirement, we
> will find that you are not disabled.

20 C.F.R. § 416.924(a).   At step one, plaintiff's age and work activity are identified.   At

step two, the impairments are identified.  A severe impairment is one that is more than "a

slight abnormality or a combination of slight abnormalities that causes no more than

minimal functional limitations." 20 C.F.R. § 416.924(c).  At step three, if plaintiff has a

severe impairment, then plaintiff must establish that his or her impairment or

combination of impairments meets or medically equals in severity and duration, an

impairment listed in the Listings of Impairments (the Listings). 20 C.F.R. Pt. 404, Subpt

P, App. 1.  If not, then the Commissioner must determine whether plaintiff's impairments

or combination of impairments functionally equal the criteria for a Listing. 20 C.F.R.

§416.926a(a)("If you have a severe impairment or combination of impairments that does

not meet or medically equal any listing, we will decide whether it results in limitations

that functionally equal the listings.  By 'functionally equal the listings,' we mean that

your impairment(s) must be of listing-level severity; i.e., it must result in 'marked'

limitations in two domains of functioning or an 'extreme' limitation in one domain, as

explained in this section.").

     C.   <u>Listing 112.05D</u>.

The structure of the mental disorders listings for children under age 18 parallels

the structure for the mental disorders listings for adults but is modified to reflect the

presentation of mental disorders in children, which are arranged in 11 diagnostic

categories.  20 CFR Pt. 404, Subpt. P, App. 1, Listing 112.00.  The diagnostic category at

issue in this case is titled Mental Retardation, which is designated as Listing 112.05.  *Id.*

Listing 112.05 states the following in the introductory remarks: "Characterized by

significantly subaverage general intellectual functioning with deficits in adaptive

functioning." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05.  Subsection D

requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical

or other mental impairment imposing additional and significant limitation of function."

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05D.

The structure of the listings for Mental Retardation (112.05) is different from that

of the other mental disorders.  20 CFR Pt. 404, Subpt. P, App. 1, Listing 112.00. Instead

of a predicating a finding of listed impairment on the satisfaction of criteria set forth in

both Paragraph A (a composite of medical findings which are used to substantiate the

existence of a disorder) and Paragraph B (describe impairment-related functional

limitations), Listing 112.05 (Intellectual Disability) provides that "if an impairment

satisfies the diagnostic description in the introductory paragraph and any one of the six

sets of criteria, we will find that the child's impairment meets the listing."  20 CFR Pt.

404, Subpt. P, App. 1, Listing 112.00.   The regulations also provide:

> For listings 112.05D and 112.05F, we will assess the degree of functional
> limitation the additional impairment(s) imposes to determine if it causes
> more than minimal functional limitations, i.e., is a "severe" impairment(s),
> as defined in § 416.924(c). If the additional impairment(s) does not cause
> limitations that are "severe" as defined in § 416.924(c), we will not find
> that the additional impairment(s) imposes an additional and significant
> limitation of function.

20 CFR Pt. 404, Subpt. P, App. 1, Listing 112.00.

To determine functional equivalence, the Commissioner must consider plaintiff's limitation of specific functioning, broad areas of development, episodic impairment, and effect of treatment or medication. 20 C.F.R. § 416.926a(b).   To determine plaintiff's level of function in the broad areas of development, the ALJ must address six domains of development or functioning:

> (i) Acquiring and using information;
>
> (ii) Attending and completing tasks;
>
> (iii) Interacting and relating with others;
>
> (iv) Moving about and manipulating objects;
>
> (v) Caring for yourself; and,
>
> (vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i-vi).   If plaintiff has an extreme limitation in one domain or marked limitation in two domains, a finding of functional equivalence will be made. 20 C.F.R. § 416.926a(d),(e),(f).[6]

An extreme limitation of function occurs when the impairment "interferes very seriously with [plaintiff's] ability to independently initiate, sustain or complete activities". 20 C.F.R. § 416.926(e)(3)(i).   This limitation may occur whether the impairment limits one activity or the cumulative effect of plaintiff's impairments limit several activities, and is given to the "worst limitations." *Id*.  Also, the regulations state

---

[6] The regulation sets forth the methods for using each domain to evaluate functional equivalence to a listing. 20 C.F.R. § 416.926a(f)-(l).

that an extreme limitation is "the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id*.[7]

A marked limitation of function occurs when the impairment "interferes seriously with [plaintiff's] ability to independently initiate, sustain or complete activities". 20 C.F.R. § 416.926(e)(2)(i).  This limitation may occur whether the impairment limits one activity or the cumulative effect of plaintiff's impairments limit several activities. *Id*. Also, the regulations state that a marked limitation is "the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id*.[8]

IV.   Statement of Relevant Facts.

   A.   Medical and Nonmedical Evidence before the ALJ.

M.H. began treatment with Milton S. Brasfield, III, MD, on June 10, 1998. Records show he was born at 25 weeks gestation on September 20, 1997, and weighed one pound, seven ounces at birth. (Tr. 229). Most of the treatment records are illegible or

---

[7] The regulations further discuss this standard in terms of functioning according to chronological age, the use of standardized test scores to measure functioning in a domain, and for the sixth domain of functioning, health and physical well-being, the frequency of exacerbation of the impairment. 20 C.F.R. § 416.926(e)(2)(i)-(iv). Additionally, 20 C.F.R. § 416.926(e)(4) explains the method for consideration of standardized test scores.

[8] The regulations further discuss this standard in terms of functioning according to chronological age, the use of standardized test scores to measure functioning in a domain, and for the sixth domain of functioning, health and physical well-being, the frequency of exacerbation of the impairment. 20 C.F.R. § 416.926(e)(2)(i)-(iv).   Additionally, 20 C.F.R. § 416.926(e)(4) explains the method for consideration of standardized test scores.

show treatment for upper respiratory infection, tinea,[9] and various childhood illnesses

(Tr. 228-248, 281-286, 315-319).

M.H. had an audiology examination on March 27, 2007, at Children's Hospital.

Audiogram showed "mild high-frequency sensorineural hearing loss" in the left ear with

normal hearing in the right ear (Tr. 225-227). The hearing loss was confirmed in 2008

and again in 2010 at Childrens Rehabilitation Services ("CRS") (Tr. 249-251, 287-314).

During the September 2, 2008, CRS Hearing Assessment Clinic, plaintiff reported that

her main concern was that M.H. was "not doing well in school, especially with math and

reading, however, he is doing well in spelling and science [and] does not receive special

education services at this time" (Tr. 251, 307-308).  Dr. James H. Walburn, ENT,

reported on September 18, 2008, that:

> There is no medical contraindication for use of amplification on a trial basis
> in the left ear, while we are working through this for need for special
> education [sic].  Have a hearing aid evaluation.  A trial run in the classroom
> setting.  He needs to sit with his right ear closes[t] to the teacher with a
> request for preferential seating from [his school].  We will see him back
> here in 6 months [for follow-up testing], but can return to hearing aid clinic
> as needed.

(Tr. 250, 306).   M.H.'s presented for follow-up visits to the CRS Hearing Assessment

Clinic on May 20, 2009 (Tr. 300-305) and February 18, 2010 (Tr. 289-299).  His hearing

loss was described as "stable" and it was recommended each time that he receive

"preferential classroom seating" (Tr. 289, 295, 300).

---

[9] Tinea is the scientific term for ringworm.  http://www.medicinenet.com.

On October 17, 2008, M.H.'s fourth-grade teacher, Inez Craig, completed a teacher questionnaire (Tr. 162-71) which specifically addressed, through a series of related questions, the six domains of functioning that the ALJ was required to assess in this case.  Ms. Craig indicated that M.H. had "an obvious problem" with respect to two aspects[10] in the domain of "acquiring and using information," and "a serious problem" in the remaining eight aspects[11] (Tr. 165).  Ms. Craig also indicated that M.H. often appeared to be lost to daydream (Tr. 165).  M.H. had "a slight problem" in five aspects[12] in the domain of "attending and completing tasks," an "obvious problem in five aspects[13], and a "serious problem" in the remaining three aspects[14] (Tr. 166).  In the domain of "interacting and relating to others," M.H. had no more than a "slight problem" with any aspect of this domain (Tr. 167).  Ms. Craig indicated that his "social abilities seem

---

[10] M.H. had an obvious problem "[u]nderstanding school and content vocabulary" and "[r]eading and comprehending written material" (Tr. 165).

[11] M.H. had a serious problem with comprehending oral instructions, comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions (Tr. 165).  It was noted that M.H. "does participate in class discussion but the information is often irrelevant" (Tr. 165).

[12] M.H. had only a "slight problem" paying attention when spoken to directly, sustaining attention during play/sports activities, focusing long enough to finish assigned activity or task, carrying out single-step instructions, and waiting to take turns (Tr. 166).

[13] M.H. had an "obvious problem" refocusing to task when necessary, carrying out multi-step instructions, changing from one activity to another without being disruptive, organizing own things or school materials, and working at reasonable pace/finishing on time (Tr. 166).  It was noted that M.H. "does not self direct to the task at hand without teacher prompting [and] struggles to complete his assignments" (Tr. 166).

[14] M.H. had a "serious problem" completing class/homework assignments, completing work accurately without careless mistakes, and working without distracting self or others" (Tr. 166).

normal for age but he seems to have a difficult time sharing information that is relative [sic] [and] understanding oral instructions" (Tr. 167). M.H. had no problems moving about and manipulating objects, and caring for himself (Tr. 168-69). In health and physical well-being, M.H. had hearing loss, but "according to doctors, it should not have a direct impact on his classroom functioning" (Tr. 170).

On October 20, 2008, M.H.'s former special education teacher, K. Scarbough, completed a "function report – child," indicating that M.H. had a sensorineneural hearing loss, which was a "[h]igh frequency loss [for which the] Doctor doesn't think an [sic] hearing aid would help" (Tr. 174).  She also noted that he was able to talk and was not limited in his ability to communicate (Tr. 175-176).  M.H.'s ability to progress in learning was limited in that he could not read and understand stories in books or magazines, write longhand, write a simple story with 6-7 sentences, understand money and make correct change, or tell time (Tr. 177). M.H.'s physical abilities were not limited, and his impairments did not affect his behavior with other people or his ability to help himself and cooperate with others in taking care of personal needs (Tr. 179-80). His ability to pay attention and stick with a task was limited in that, although he could keep busy on his own, he could not finish things he started, work on arts and crafts projects, complete homework, or complete chores most of the time (Tr. 180).

A grade report card for the first nine weeks of the fourth grade showed that M.H. received two A's (90-100) in spelling and physical education, four C's (70-79) in Language (71) handwriting (79), science (75) and social studies (75), and one D (60-69) in reading (69) (Tr. 192).

Samuel Williams, M.D., a State agency medical consultant, reviewed the record and completed a childhood disability evaluation form in November 2008, indicating that M.H.'s left sensorineural hearing loss and history of low birth weight were severe impairments, but did not meet, medically equal, or functionally equal the listings (Tr. 253). Dr. Williams found that M.H. had a less than marked limitation in acquiring and using information, a marked limitation in attending and completing tasks, no limitation in interacting and relating with others, moving about and manipulating objects, and caring for himself, and a less than marked limitation in health and physical well-being (Tr. 255-56).  Dr. Williams noted, with respect to the domain of "acquiring and using information," that M.H. was passing all his courses according to his grade report dated October 20, 2008 (Tr. 255).

On March 29, 2010, M.H. was seen by Milton Brasfield, M.D., for a well child exam (Tr. 316).  M.H. reported that he was in the fifth grade and was doing well in school (Tr. 316). His grades were mostly C's (Tr. 316). He was involved in football and basketball (Tr. 316).

On July 7, 2010, Donald Blanton, Ph.D., evaluated M.H. at the request of Plaintiff's attorney (Tr. 320-23). Plaintiff reported that M.H. was entering the sixth grade in a special education class (Tr. 320). IQ testing showed that M.H. had a full scale IQ of 63 (Tr. 321). Dr. Blanton diagnosed M.H. with mild mental retardation (Tr. 322). He

assigned M.H. a global assessment of functioning (GAF) rating of 60[15] (Tr. 322). Dr.

Blanton indicated that M.H. had marked limitation in understanding vocabulary,

comprehending written material, comprehending and doing math problems, participating

in class discussions, providing organized oral explanations and adequate descriptions,

expressing ideas in written form, learning new material, recalling and applying

previously learned material, and applying problem solving skills in class discussion (Tr.

323).

        B.     Plaintiff's Testimony.

At the August 2010 hearing, Plaintiff testified that M.H. went to kindergarten and

repeated the first grade (Tr. 34). M.H. was born with hearing problems in both ears

(Tr. 34). His hearing aides were not helping, and it would not improve with an operation

(Tr. 35). M.H. was in regular class, but a Special Education teacher comes to his regular

class to help him with reading and math (Tr. 36). He did not participate in sports, but

played basketball by himself (Tr. 37-38). M.H. watched television, did homework, and

played a game (Tr. 38). He did not play video games (Tr. 38). He went to Sunday school

every Sunday and was involved in the choir (Tr. 38). M.H. was suspended when he was

in the first grade, but had not been suspended or expelled from school since 2008 (Tr.

40). M.H. could not tell time or count money (Tr. 42). When M.H. was in the fourth

---

[15] A GAF rating of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." *See* American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR) at 34.

grade, it was decided he needed special education after failing his hearing test (Tr. 43).

He took the hearing test every year, but had never passed it (Tr. 43).

C.     The Administrative Law Judge's Decision.

The ALJ found that M.H. was born in 1997 and was, therefore, a school-age child

on September 19, 2008, the amended alleged onset date, and an adolescent at the time of

the ALJ's decision (Tr. 14).  M.H. had not engaged in substantial gainful activity since

the onset date (Tr. 14). The ALJ found that M.H. had the following "severe"

impairments: bilateral sensorineural hearing loss and status post history of low birth

weight (Tr. 14). The ALJ also found that M.H. did not have an impairment or

combination of impairments that met or medically equaled one of the listed impairments

in 20 C.F.R. pt. 404, Subpt. P, App. 1 (Tr. 14-15).  The ALJ noted (Tr. 17) the Function

Report (Tr. 171-182) completed on October 20, 2008, by M.H.'s  Special Education

Teacher and found that his "ability to progress in learning is limited in reading and

understanding stories in books and magazines; writing in longhand (script); writing a

simple story with 6-7 sentences; understanding money – [i.e. the ability to] make correct

change; and telling time" (Tr. 17).[16]  The ALJ also found that M.H.'s "ability to pay

attention and stick with a task is limited in keeping busy on his own" (Tr. 17).[17]

---

[16] *C.f.*  Tr. 177 and Tr. 17.

[17] The Special Education Teacher reported that M.H. does not finish things he starts; does not
work on arts and crafts projects which involve drawing, painting, knitting or woodwork; does not
complete his homework; and does not complete chores most of the time (Tr. 181).  The ALJ made no
reference to the Special Education Teacher's report with respect to his finding that M.H. was not mentally
retarded because "there is no evidence of special education" (Tr. 20).

The ALJ acknowledged the report submitted by Donald W. Blanton, Ph.D. in which it was reported that M.H. "will be in the 6th grade in a special education class in the fall" (Tr. 18).  The ALJ gave "very little weight" to Dr. Blanton's opinion, however, on the grounds that "there is no evidence of special education (See Exhibits C-6E [Tr. 164-171],C-10E [Tr. 192]) [and] if the claimant was mentally retarded he would be [in] special education for all subjects not just for special help in math and reading" (Tr. 20).

The ALJ determined, based on his review of the evidence (Tr. 15-21), that M.H.'s performance in the six domains of functioning was as follows:

(1) Acquiring and using information–     Less than marked limitation (Tr. 21-22).

(2) Attending and completing tasks–     Marked limitation (Tr. 22-23).

(3) Interacting and relating with others–   No limitation (Tr. 23-24).

(4) Moving about and manipulating objects– No limitation (Tr. 24-25).

(5) Caring for yourself–                      No limitation (Tr. 25-26).

(6) Health and physical well-being–     Less than marked limitation (Tr. 26-27).

The ALJ concluded that M.H.'s impairments did not functionally equal a listing because he did not have "marked" limitations in two domains or an "extreme" limitation in one domain, (Tr. 15).  The ALJ concluded, therefore, that M.H. was not disabled under the Act (Tr. 27).

D.     Nonmedical Evidence Submitted to the Appeals Council.

A transcript report showed that M.H. repeated the first grade. In his repeated first grade, he received 2 A's, 10 B's, and four C's (Tr. 214). In second grade, M.H. received three A's, six B's, four C's, and one D (Tr. 214). In third grade, M.H. received three A's,

three C's, five D's, and three F's (Tr. 214).

A student transcript showed that in fourth grade (1st and 2nd semesters), M.H. received three A's, eight C's, and five D's (Tr. 220). In fifth grade (1st and 2nd semesters), M.H. received three A's, eight C's, four D's, and one F (Tr. 221). In sixth grade (1st and 2nd semesters), M.H. received two A's, one B, seven C's, and four D's (Tr. 221).

M.H.'s May 2010 Individualized Education Program (IEP)[18] reported that M.H. was in the sixth grade in general education classes during the 2010-2011 academic year (Tr. 201). He faced difficulty in reading and math (Tr. 201), and was scheduled for small group instruction in these subjects from the special education staff, as well as accommodation for proximity seating, scheduled breaks, shortened assignments, and materials read to the student (Tr. 203-06).

V.    Analysis.

A.    **The ALJ did not err by failing to consider the school records which plaintiff contends were submitted on June 16, 2010, and August 10, 2010?**

Although plaintiff contends that "an updated transcript that included first grade through fourth grade" was submitted on June 16, 2010, and that "the IEP for 2010-2011" was submitted on August 10, 2010, plaintiff concedes that "[t]he ALJ did not

---

[18] The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals.  Ass'n for Cmty. Living in Colo. V. Romer, 992 F.2d 1040, 1043 (10th Cir. 1993); see also 20 U.S.C. § 1414(d)(1)(A) (defining IEP in more detail).

acknowledge receipt of the evidence and the evidence did not appear on the exhibit list attached to his decision." (Doc. 18 at 8). Plaintiff has proffered no proof that the ALJ ever received this evidence. In addition, plaintiff's counsel was given the opportunity at the commencement of the hearing on August 3, 2010, to examine the exhibits admitted into evidence and he made no assertion that the record was in any manner incomplete (Tr. 33). Nor did counsel ever request that the record be kept open in order to supplement the record. The ALJ did not, therefore, reject this evidence or commit reversible error.

Moreover, this evidence was submitted to the Appeals Council (Tr. 201-214), and considered as part of its denial of review (Tr. 1-7). The Appeals Council specifically concluded that the "new" evidence "does not provide a basis for changing the Administrative Law Judge's decision" (Tr. 2).

B.   **The ALJ erred in discounting the opinion of plaintiff's retained examining consultant, Donald W. Blanton, Ph.D.**

Plaintiff argues that the ALJ erred in rejecting Dr. Blanton's opinion because, in sum, (1) it is irrelevant that M.H. was not in separate special education classes (it was sufficient that he was getting special education assistance with his reading and math); (2) records not before the ALJ for reasons previously stated showed that M.H. failed the first grade and was doing poorly until his performance "was enhanced after the accommodation allowed by the IEP"; (3) the fact that he "passed his classes after the application of his IEP simply . . . supports a finding of mental retardation"; (4) Dr. Blanton's opinion is uncontroverted; and (5) the ALJ should have ordered additional

testing if he was uncertain as to the validity of the IQ scores obtained by Dr. Blanton. (Doc. 18 at 8-9).

The ALJ may discount a medical source opinion for good cause where the medical source's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding.  *See* Holloman v. Colvin, 2013 WL 2903287, *6 (M.D. Ala. June 13, 2013), *citing* Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987).  *See also* 20 C.F.R. §§ 404.1527(c)(4) (An ALJ must consider whether an opinion is consistent with the record as a whole).  Here, the ALJ rejected the opinion of Dr. Blanton, a one-time examining medical source, on the following grounds:

> [T]here is no evidence of special education (See Exhibits c-6E [Tr. 164-171], C-10E [Tr. 192]).  The undersigned noted that if the claimant was mentally retarded he would be [in] special education for all subjects not just for special help in math and reading, as the mother's testimony indicates. The grades at Exhibit C10E [Tr. 192] are inconsistent with someone who is mentally retarded, as such were obtained in regular classes, and the limits set forth in Dr. Blanton's assessment appear additionally inconsistent with someone with a Global Assessment Functioning of 60.

(Tr. 20).   The ALJ's opinion is, however, in error because he not only failed to acknowledge that "the claimant's teacher" who completed the Function Report he referred to in his decision (Tr. 17) was M.H.'s Special Education Teacher (Tr. 173), but he ignores prevailing law regarding "mainstreaming" and special education under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.

At the outset, the Supreme Court emphasized that the IDEA "requires participating States to educate handicapped children with nonhandicapped children whenever possible."   Board of Educ. of Hendrick Hudson Central School Dist., Westchester

County v. Rowley, 458 U.S. 176, 202 (1982).  The Supreme Court noted that "20 U.S.C.

§ 1412(5) requires that participating States establish 'procedures to assure that, to the

maximum extent appropriate, handicapped children, including children in public or

private institutions or other care facilities, are educated with children who are not

handicapped, and that special classes, separate schooling, or other removal of

handicapped children from the regular educational environment occurs only when the

nature or severity of the handicap is such that education in regular classes with the use of

supplementary aids and services cannot be achieved satisfactorily'."  *Id*. at 203, n. 24.

*See also* CP v. Leon County School Bd. Florida, 483 F.3d 1151, 1152 (11th Cir.

2007)("The purpose of the IDEA generally is "to ensure that all children with disabilities

have available to them a free appropriate public education that emphasizes special

education and related services designed to meet their unique needs and prepare them for

further education, employment, and independent living."), *quoting*  20 U.S.C. §

1400(d)(1)(A).

     "IDEA requires the development of an individualized education program ("IEP")

for each child falling within the purview of IDEA [which] are created and periodically

reviewed following meetings at which parents, teachers, other school personnel, and

educational experts all participate."  Klein Independent School Dist. v. Hovem, 690 F.3d

390, 395 (5th Cir. 2012), *citing* 20 U.S.C. § 1414(d)(1)(B).  "One of the primary goals of

IDEA is '***mainstreaming***'."  J.H. ex rel. A.H. v. Fort Bend Independent School Dist., 482

Fed.Appx. 915, 917 (5th Cir. 2012), *citing* Daniel R.R. v. State Bd. of Educ., 874 F.2d

1036, 1044 (5th Cir. 1989) (emphasis added).  "An IEP must place a disabled child in the

'**least restrictive environment**' ('LRE') required by his needs." *Id*. at 917-18, *citing* R.H.
v. Plano Indep. School Dist., 607 F.3d 1003, 1008 (5th Cir. 2010)(emphasis added).
Under IDEA, "a disabled child should be placed in special classes only when education
in regular classes with the use of supplementary services cannot be achieved
satisfactorily." *Id*., *citing* 20 U.S.C. § 1412(a)(5)(A); Daniel R.R., 874 F.2d at 1039. *See
also*, A.B. v. Clarke County School Dist., 2009 WL 1606544, * 7 (M.D. Ga., June 08,
2009)(Under the IDEA, a free appropriate public education in the least restrictive
environment must be provided.).

　　　In this case, the ALJ erred when he held that Dr. Blanton's finding of mental
retardation was inconsistent with the fact that M.H. is not in special education classes for
all subjects but merely receives "special help in math and reading" (Tr. 20).   The fact
that mainstreaming constituted the least restrictive environment within which M.H. could
be educated was not evidence inconsistent with a diagnosis of mental retardation.

　　　The ALJ further erred when he concluded that "the limits set forth in Dr.
Blanton's assessment appear additionally inconsistent with someone with a Global
Assessment Functioning of 60."[19] (Tr. 20).  The Global Assessment of Functioning
(GAF) Scale describes the overall psychological, social, and occupational functioning
resulting from mental illness, but without inclusion of any impaired functioning caused
by physical or environmental limitations. *Diagnostic and Statistical Manual of Mental
Disorders, American Psychiatric Association*, 4th ed.1994, at 32. The Commissioner has

---

[19] *See* n. 15, *supra*.

declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listing." *See* Nye v. Commissioner of Social Sec., 2013 WL 3869964, * 4 (11th Cir. July 26, 2013)("the Commissioner has noted that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings."), *quoting* 65 Fed.Reg. 50746, 50764–65 (Aug. 21, 2000).

The ALJ also concluded that Dr. Blanton's opinion was inconsistent with M.H.'s school grades (Tr. 20).  However, the ALJ only considered M.H.'s partial fourth-grade transcript (Tr. 192).   He made no effort to obtain the additional school transcripts from first through sixth grades (Tr. 214, 219-221), even though the evidence established that M.H. was receiving Special Education.  *See* Tr. 173-182.   The fact that the special assistance M.H. received in reading and math may have enhanced his grades in those specific areas as well as his other courses is not inconsistent with M.H.'s IQ score of 63, Dr. Blanton's assessment or the diagnosis of mental retardation. Consequently, the ALJ's decision is not supported by substantial evidence because he erroneously rejected Dr. Blanton's opinion.

        C.      **The case must be remanded in order to determine whether M.H.'s impairment met the requirements of Listing 112.05D.**

Plaintiff contends that M.H. meets the criteria for Listing 112.05D because Dr. Blanton presented evidence of a valid Full Scale IQ score of 63 (Tr. 321) and "[t]he ALJ found M.H. had the severe impairments of sensorineural hearing loss bilateral; and status

post history of low birth weight. (Tr. 33)." (Doc. 18 at 9). Neither the IQ score nor the designation of M.H.'s hearing loss as "severe" is sufficient here alone or in combination.

Although the ALJ characterized M.H.'s high frequency left-ear hearing loss as a severe impairment, the medical record shows that no hearing aid—or any other treatment—was prescribed for it other than "preferential classroom seating" (Tr. 290, 289-314). School records have provided no indication that M.H's hearing loss has affected his ability to perform his school work (*see* Tr. 170,[20] 192, 219-221). The Eleventh Circuit has held that "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); Flynn v. Heckler, 768 F.2d 1273 (11th Cir. 1985); Pritchett v. Colvin, 2013 WL 3894960, *5 (S.D. Ala. July 29, 2013); *cf.* 20 C.F.R. § 404.1521(a).[21] The Eleventh Circuit has gone on to say that "[t]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). Under SSR 96-3p, "evidence about the functionally limiting effects of an individual's impairment(s) must be evaluated in order to assess the effect of the impairment(s) on an individual's ability to do basic work activities." In this

---

[20] Ms. Craig reported that M.H. "does experience some hearing loss, but according to the doctors, it should not have a direct impact on his classroom functioning" (Tr. 170).

[21] "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

case, the ALJ did not obtain all relevant school records and the I.E.P.'s subsequently submitted and/or available raises a question regarding whether or not M.H.'s hearing loss has impacted his ability to complete his school work.

In addition, as stated above, M.H. must have "significantly subaverage general intellectual functioning *with deficits in adaptive functioning*" in order to meet the diagnostic description of mental retardation.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05.   This definition is consistent with the medical criteria for diagnosing mental retardation. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, *20022, 2002 WL 661740.

"[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior." Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (*citing* Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir.1986).

> Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation. ***Adaptive functioning*** refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.

DSM-IV-TR (emphasis in original).

Here, the ALJ does not challenge the validity of M.H.'s full scale IQ score of 63. To the extent the ALJ held that the record evidence with regard to M.H.'s adaptive functioning was not consistent with mental retardation, the ALJ applied an incorrect standard by assuming that a child with mental retardation could not be mainstreamed but,

instead, had to be placed in special education classes for all subjects.  The case must be

remanded and M.H.'s impairments evaluated under the proper standard, including

consideration of all the relevant school transcripts and the I.E.P. developed in May of

2010 pursuant to the requirements of the IDEA.

> D.    **The Appeals Council erred in failing to remand the case for consideration of the school records submitted to it.**

Plaintiff contends that "updated school records and an updated IEP" was

submitted to the Appeals Council on December 12, 2011 and they did not properly

evaluate the new evidence.  (Doc. 18 at 10).  Plaintiff relies on Perkins v. Astrue, 2012

WL 250825, *4 (S.D. Ala., June 29, 2012)("[T]he Appeals Council here did not

demonstrate that it adequately evaluated the new evidence or did anything more than

perfunctorily adhere to the ALJ's decision. On that basis alone, the case must be

remanded to the Commissioner."), *citing* Epps v. Harris, 624 F.2d 1267, 1273 (5th Cir.

1980) ("The AC must show in its written denial of review that it has evaluated adequately

the new evidence.").

There are school records in the transcript (*Id*. *citing* Tr. 219-221) that have been

designated by the Appeals Council as Exhibit C14E (Tr. 5).  These records report M.H.'s

grades in increments of "1st Nine Weeks," "1st Semester," "2nd Semester," and "3rd Nine

Weeks" of the years 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009 and

2009-2010, as well as two increments of 2010-2011 (Tr. 219-221).  These appear to be

the records submitted by the plaintiff to the Appeals Council on December 12, 2011 (Tr.

216).

There is some confusion regarding the two I.E.P's at issue on this appeal.  In counsel's letter dated December 12, 2011, plaintiff is said to be submitting an "IEP dated November 18, 2011" (Tr. 216). Plaintiff complains that the Appeals Council "did not respond to the IEP in any manner" (doc. 18 at 4) and "did not acknowledge the IEP" (doc. 18 at 10).  The Commissioner argues that "Plaintiff has not shown that the Appeals Council ever received this evidence." (Doc. 24 at 13).  However, the Appeals Counsel included in its Exhibit C14E a page entitled "Notice of Proposed Meeting/Consent for Agency Participation" dated November 18, 2011 (Tr. 222).  This page (Tr. 222) corresponds to the first page of the document plaintiff sought to add to the record (doc. 16-1 at 5), which is an I.E.P. developed for the school year from August 11, 2011 to May 11, 2012 (doc. 16-1 at 15).  A question, therefore, remains as to whether the Appeals Council received only one page or the entire I.E.P dated November 18, 2011 and governing the 2011-2012 school year.  However, the Commissioner also challenges this IEP's relevance inasmuch as it pertains to a period after the September 27, 2010 decision by the ALJ.

There is also a second I.E.P. in this record that was before the Appeals Council, as evidenced by its designation as Exhibit C12E (Tr. 5), and is relevant because it was developed on May 7, 2010 to govern the school year from August 8, 2010 to May 25, 2011 (Tr. 201-211).  The Appeals Council stated that it had considered the additional evidence Plaintiff submitted, namely the "updated school records" (Tr. 215-222), but was denying review because that evidence did not provide a basis for changing the ALJ's decision (Tr. 1-2).  The Appeals Council therefore did not reverse the ALJ's opinion to

the extent that it was based on the application of an incorrect standard, namely the assumption that a child with mental retardation could not be mainstreamed but, instead, had to be placed in special education classes for all subjects.  Nor did the Appeals Council remand the case to the ALJ for further evaluation of M.H.'s impairments under the proper standard and with directions to include consideration of all the relevant school transcripts and the I.E.P. developed in May of 2010 pursuant to the requirements of the IDEA.

"[T]he Appeals Council was not required to provide a more thorough explanation than it did." Mansfield v. Astrue, 395 F. App'x 528, 530 (11th Cir. 2010).   However, "[w]hen a claimant properly presents new evidence to the Appeals Council and it denies review, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." Id. (quoting Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007) (internal quotation marks omitted)).  In this case, the I.E.P. developed in May of 2010 to govern the school year from August 8, 2010 to May 25, 2011 (Tr. 201-211) established that M.H. was in fact in a special education program and that his school performance as a whole was relevant to his qualification for the I.E.P.  Dr. Blanton's opinion (Tr. 320-323) is, therefore, consistent with the evidence of record.  Consequently, it was error in light of the "updated school records" (Tr. 219—221) and the I.E.P. developed in May of 2010 (Tr. 201-211) to conclude that M.H. obtained grades that were not indicative of an individual "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning" as required for Listing 112.05D (mental retardation).  (Tr. 20; Doc. 24 at 13; 20 C.F.R. Part 404, Subpart

P, Appendix 1, Listing 112.05.).  The ALJ's decision was not supported by substantial

evidence on the record as a whole and the Appeals Council's denial of review was

improper.  The ALJ's opinion must be reversed and the case remanded pursuant to

sentence four of 42 U.S.C. § 405(g) for further proceedings.

CONCLUSION.

For the reasons stated above, the Court concludes and it is therefore **ORDERED**

that the decision of the Commissioner denying plaintiff's application on behalf of her

minor son for SSI benefits is supported by substantial evidence and is due to be and is

hereby **REVERSED** and the case **REMANDED** for further proceeding not inconsistent

with this decision.

In light of the foregoing, and the plain language of sentence four of 42 U.S.C. §

405(g), the undersigned Magistrate Judge recommends that this cause be reversed and

remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.  *See*

Melkonyan v. Sullivan, 501 U.S. 89, 99-102 (1991)(Discussing distinction between

sentence four and sentence six remand under §  405(g).).[22]  A remand pursuant to

---

[22] The Supreme Court has held that 42 U.S.C. § 405(g) provides only two kinds of remands: "(1) remands pursuant to the fourth sentence, and (2) remands pursuant to the sixth sentence."  Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).  "The fourth sentence of § 405(g) authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing'."  (*Id*.)  With respect to sixth sentence of § 405(g), the Supreme Court held:

> The district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding [and] . . . the Secretary must return to the district court to "file with the court any such additional or modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based."

(Continued)

sentence four of § 405(g) makes the plaintiff a prevailing party for purposes of the Equal Access to Justice Act, 28 U.S.C. § 2412, and terminates this Court's jurisdiction over this matter. *See* Shalala v. Schaefer, 509 U.S. 292, 297 (1993)(A district court remanding a case pursuant to sentence four of § 405 must enter judgment in the case and may not retain jurisdiction over the administrative proceedings on remand.)

    **DONE** this   30th   day of August, 2013.

                    /s/ Katherine P. Nelson
                    KATHERINE P. NELSON
                    UNITED STATES MAGISTRATE JUDGE

---

*Id.*, *quoting* 42 U.S.C. § 405(g), (internal citation omitted).